Filed 6/6/24  P. v. Arroyo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049202 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 19CR000624) |
| v. | |
| RAUL GONZALEZ ARROYO, | |
| Defendant and Appellant. | |

A jury convicted defendant Raul Gonzalez Arroyo of several sex offenses involving his granddaughter, Jane Doe.[1]  The trial court sentenced him to a term of nine years and eight months in prison.

On appeal, Gonzalez Arroyo argues: (1) the trial court erred by excluding evidence of Doe's alleged prior sexual conduct and DNA evidence from one of the stains on her bedding, (2) the prosecutor committed misconduct by misleading the trial court during the hearing on in limine motions, (3) the trial court improperly admitted expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS),[2] (4) the trial

---

[1] The victim was identified as Jane Doe throughout the trial and we will continue that designation to protect her privacy interests.  (Cal. Rules of Court, rule 8.90(b)(4).) Unspecified rule references are to the California Rules of Court.

[2] Consistent with language used in California case authority, we refer to this testimony as CSAAS evidence or CSAAS testimony in this opinion, despite the parties' (continued)

court erred by instructing the jury with CALCRIM No. 1193 which explains how they should evaluate CSAAS testimony, and (5) the cumulative effect of these errors warrants reversal. Gonzalez Arroyo also raises two claims regarding his sentencing: (1) he is entitled to resentencing because the trial court no longer has the authority to impose an upper term sentence unless a jury has found true the aggravating circumstances, and (2) he is entitled to an additional 16 days of presentence conduct credits.

As we explain below, we reject Gonzalez Arroyo's arguments relating to alleged evidentiary, prosecutorial misconduct, and jury instruction errors in their entirety. We agree, however, that he is entitled to resentencing under the current version of Penal Code section 1170, subdivision (b)(2)[3] and that he is entitled to additional presentence conduct credits. Accordingly, we will reverse the judgment and remand for the limited purpose of resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedure

On October 9, 2019, the Monterey County District Attorney filed an information charging Gonzalez Arroyo with two counts of committing a lewd act on a child (§ 288, subd. (c)(1); counts 1, 2); contact with a minor for a sexual offense (§ 288.3, subd. (a); count 3); and rape of an unconscious person (§ 261, subd. (a)(4); count 4). At the conclusion of the trial, the jury convicted Gonzalez Arroyo on all four counts.

On June 16, 2021, the trial court sentenced Gonzalez Arroyo to a total term of nine years and eight months, consisting of the upper term of eight years on count 4 plus two consecutive eight-month terms (one-third of the middle term of two years) on counts 1 and 2 plus a consecutive four-month term (one-third of the middle term of one year) on

---

pre-trial agreement not to use the term CSAAS at trial. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 169 (*Lapenias*) [summarizing the five components of CSAAS].)

[3] Unspecified statutory references are to the Penal Code.

2

count 3.  The trial court awarded 47 custody credits plus 7 days of conduct credits, calculated at 15 percent pursuant to section 2933.1, for a total of 54 days.

The trial court imposed a $3,000 restitution fund fine (§ 1202.4, subd. (b)), a parole violation restitution fund fine of $3,000 (§ 1202.45) (stayed pending successful completion of parole), a $1,310 sex offender fine (§ 290.3), a $160 court operations assessment (§ 1465.8, subd. (a)(1)), and a $120 court facilities assessment (Gov. Code, § 70373).

Gonzalez Arroyo timely appealed.

### B. Facts

#### 1. Prosecution case

##### a. Doe's testimony

Doe testified that, when she was 13 years old, she lived with her parents and three of her siblings.[4]  At the end of seventh grade, Doe and her siblings went into foster care when her older sister reported being sexually molested by their parents.

In eighth grade, Doe and four of her siblings went to live with her grandfather, Gonzalez Arroyo, and step-grandmother, L.A.[5]  At first, Doe enjoyed living with her grandparents because they allowed her to be involved in school activities whereas her parents would not allow her to do much of anything.  Doe had her own bedroom in the house.

During Doe's freshman year,[6] however, Gonzalez Arroyo started treating her differently.  Doe had joined the Navy Junior Reserve Officer Training Corps (NJROTC)

---

[4] Doe had a total of eight siblings, including half-siblings and adopted siblings.

[5] We refer to this person by her initials as use of her name would defeat the objective of anonymity for the victim. (Rule 8.90(b)(11).)

[6] Doe was born in 2001 and was a high school freshman in 2015 and 2016.

3

and she began dating a boy, A.C.,[7] in that program.  Doe told Gonzalez Arroyo that she was dating A.C. toward the end of her Christmas break and he expressed his disapproval.

Gonzalez Arroyo started to touch Doe and say things that made her uncomfortable.  He would touch her lower back, tap her on the rear end, grab her waist, and say she was looking "very cute."

In January 2016,[8] Doe woke up in the middle of the night and saw Gonzalez Arroyo in her room.  Gonzalez Arroyo was naked, and Doe noticed that her sweatpants had been pulled down to her knees.  Gonzalez Arroyo asked for a "chance with [her.]"  Doe "felt very uncomfortable and violated," moved as far from Gonzalez Arroyo as she could, and asked him to get out of her room.  Gonzalez Arroyo left.  After that, Doe began to regularly lock her door and, at one point, would secure it further using a chair.

Within a day or two, Doe told A.C. what happened, and he told her she should report it.  Doe did not do so because she feared being separated from her siblings again.

Gonzalez Arroyo became much stricter with Doe and would not allow her to stay for NJROTC practices in the morning or after school, "regulating when [she] was allowed to go out."  Whenever Gonzalez Arroyo was alone with Doe he would touch her and "ask [her] for [] a chance."  Gonzalez Arroyo would say that Doe was "a woman now."

In February, Doe woke up again in the middle of the night.  Gonzalez Arroyo was on top of her, naked.  Doe was still wearing her pajama top but her pajama bottoms had been removed.  Doe told Gonzalez Arroyo to get off.  Gonzalez Arroyo got off of Doe and, after a little while, left the room.

---

[7] To protect their privacy interests, as well as that of the victim, we refer to the witnesses by their initials.  (rules 8.90(b)(10), (11).)

[8] Unless otherwise specified, all dates are in 2016.

In May, as Doe's birthday was approaching, Gonzalez Arroyo told her that she needed to have sex with him if she wanted a party. Doe felt "hopeless" and did not know what to do. She felt as if she "had to give [her]self up just to be able to have a normal thing, like a birthday party." Doe did not report Gonzalez Arroyo to anyone as she was still afraid of being separated from her siblings.

Doe was allowed to have a party after her actual birthday. The day before the party, Gonzalez Arroyo told Doe he "was going to come into [her] room whether [she] like[d] it or not." Doe smoked marijuana and ate an edible on the way home in order to not "feel anything" and to be out of her own body. When Doe got home, she was still feeling the effects of the marijuana. Doe went to her bedroom and fell asleep around 8:00 p.m.

Doe woke up with Gonzalez Arroyo, who was naked, on top of her. Doe's pajama bottoms had been pulled down and Gonzalez Arroyo was thrusting his penis into her vagina. Doe said it took her around 45 seconds to comprehend what was happening. She was initially frozen in shock but then was able to move and get Gonzalez Arroyo off of her. Doe felt wetness in her vagina and on her sheets. Gonzalez Arroyo eventually left her bedroom.

Doe waited 10 to 15 minutes until she thought Gonzalez Arroyo was asleep in his bed, then she went to the bathroom to clean herself. Doe noticed some blood from her vagina, and her bedsheets had a "sticky wet feeling."

Later that month, Doe came home from school and Gonzalez Arroyo came up to her in the hallway. Gonzalez Arroyo said that he wanted "another chance because the first time wasn't as enjoyable for him." Doe refused.

A couple of days after the May incident, Doe told her friend S.R. and her (former) boyfriend, A.C., about what Gonzalez Arroyo had done. A.C. said he would talk to their NJROTC captain about it. Although Doe still feared being separated from her siblings,

5

she wanted A.C.'s advice as to how to proceed. S.R. told Doe that she and her siblings could stay with her if necessary.

Doe then told her NJROTC captain, P.G., because she was afraid that Gonzalez Arroyo would molest, or perhaps already had molested, one or more of Doe's siblings. Doe did not tell L.A. what Gonzalez Arroyo had done because she felt like "[L.A.] could have known maybe, and … chose to disregard it." After speaking with P.G., Doe went to the school office, and then spoke with the police.

### b. A.C.'s testimony

A.C. and Doe met in their high school's NJROTC program and began dating. A.C. was a sophomore and Doe was a freshman. Doe introduced A.C. to Gonzalez Arroyo but Gonzalez Arroyo "was not friendly towards" him.

In February or March, Doe told A.C. that Gonzalez Arroyo would "try to come on to her, … would try to touch her, and also would say things to her to get her to do certain things." A.C. suggested that Doe tell L.A. or "someone that can take her to the police[,]" but Doe was afraid that no one would believe her and that, in the worst case, she would be separated from her siblings.

In May, Doe told A.C. that Gonzalez Arroyo "did [] something to her" when she was asleep. Doe was upset and crying during this conversation. A.C. said that Doe had to tell someone about this, but she was still reluctant to do so. A.C. advised Doe to tell their NJROTC captain, P.G., as he was "kind of like a father figure" to them.

### c. P.G.'s testimony

P.G. testified that he was the school district's program manager for the NJROTC and in May, Doe and A.C. came to his office. A.C. said that, because it was hard for Doe to talk about what they were reporting, he would speak for her. A.C. told P.G. that, the night before, a family member had gone into Doe's room and asked,

6

" 'Let me have you.' " P.G. looked at Doe and asked her to confirm that this is what happened, and she nodded her head. Doe was very emotional and teary-eyed.

Even after P.G. told Doe that she was in a safe place, she was unable to talk without crying. P.G. and school officials contacted the police and police officers came to the school that day.

### d. Officer David Garcia's testimony

On May 23, Soledad police officer David Garcia responded to Doe's high school. In the presence of a social worker, Garcia interviewed Doe at the school for 30 to 45 minutes. A recording of that interview was played for the jury.

In that interview, Doe said Gonzalez Arroyo began calling her "cute" and touching her in December 2015 after Doe had introduced A.C. as her boyfriend. After Christmas break, Doe woke up one night with Gonzalez Arroyo on top of her. Doe told him to get out, but Gonzalez Arroyo said to her "just let me." Gonzalez Arroyo was naked, but Doe had her sweats on. Gonzalez Arroyo said " 'just this one time' " but Doe refused and again told him to get out. Gonzalez Arroyo left the room.

Gonzalez Arroyo continued to compliment Doe and touch her, but also started "taking away things like the Wi-Fi" which Doe needed for her homework. Doe asked him to turn the Wi-Fi back on, but Gonzalez Arroyo said, " 'okay but you have to give me a chance.' "

Doe next told Garcia that Gonzalez Arroyo came into her room again while she was sleeping in late February or early March. Although she had locked her door, the lock could be turned from the outside with a screwdriver. Doe heard the door open and pretended to be asleep. As she heard him getting closer to her bed, Doe told him to get out. Gonzalez Arroyo was naked and said, " 'just one time, just one time.' " Doe replied, " 'no, get out' " and after repeating herself once or twice, Gonzalez Arroyo left

7

her room. Doe said that Gonzalez Arroyo had managed to pull her sweatpants and underwear down to around her knees.

Doe described the May 13 incident, which took place before her birthday party. Around midnight, Doe woke up and Gonzalez Arroyo was on top of her. Her sweatpants and underwear had been pulled off and Gonzalez Arroyo's penis was in her vagina. Doe pushed him off. Gonzalez Arroyo did not have an erection and went to his bedroom. Doe waited around 10 minutes to get out of bed and, using her phone's flashlight, saw a "clearish, creamish thing on [her] bed." She went to the bathroom and, after wiping herself, noticed some red from her hymen. Two or three days later, Gonzalez Arroyo asked Doe for "another chance" because the first time "didn't come out right."

### *e. Recorded forensic interview*

That same day (May 23), Doe was interviewed by a forensic interviewer, Lauren McFarland, at the Bates-Eldredge Child Sexual Abuse Clinic. A recording of "virtually all" of that interview was played for the jury.

Doe told McFarland that Gonzalez Arroyo had been sexually inappropriate with her "multiple times." Doe had been afraid to report his conduct the first time it happened but was doing so now because her friends had encouraged her.

Doe said that it started to happen after she introduced her boyfriend to Gonzalez Arroyo in December 2015. After meeting her boyfriend, Gonzalez Arroyo started complimenting Doe on how she looked, touching or tapping her lightly on her thigh and buttocks, and rubbing her back. Gonzalez Arroyo's compliments gave Doe "bad vibes" and made her uncomfortable.

In January, the day Doe got home from her Christmas break, she woke up sometime between 11:00 p.m. and 1:00 a.m. Gonzalez Arroyo was on top of her, naked. Gonzalez Arroyo was tugging on the waistband of her sweatpants, which is what caused her to wake up. Doe asked Gonzalez Arroyo what he was doing, and he said, "let me."

8

Doe was frightened, thinking she might get in trouble, so she did not speak loudly, but she told him no. Doe pulled away from him, and Gonzalez Arroyo eventually left her room.

The following day, Doe told A.C. about what happened. A.C. was "really pissed off" and wanted Doe to report Gonzalez Arroyo right away. Doe did not want to as she was frightened about what would happen and that she might be "put with someone worse." A.C. said that if it happened again, he would call the police if Doe did not.

Doe told McFarland she thought the next incident occurred a week after Valentine's Day. Doe woke up in the middle of the night with her sweatpants pulled off. Doe was not certain of the details of this incident and was worried it would "look like [she was] lying." Doe explained to McFarland that her older sister's reporting of sexual abuse by their father led to them moving in with Gonzalez Arroyo and now she was being abused. In addition, Doe said she was sexually assaulted by another student at the beginning of her freshman year and "people made up rumors about it." If Doe's report about Gonzalez Arroyo came out, people might say she was lying.

As to the third incident, Doe said that it took place on May 13, a day before her birthday party. The night before, Gonzalez Arroyo told Doe that he was going to come into her room "whether [she] liked it or not." Because she knew Gonzalez Arroyo would be coming into her room, Doe decided to smoke marijuana with friends, both before and after school.[9]

Doe went to bed around 7:00 p.m. or 8:00 p.m. and was "knocked out." She woke up around midnight or 1:00 a.m. with her shorts and underwear off and Gonzalez Arroyo thrusting on top of her, with his penis in her vagina. Doe got scared and pushed him off. Gonzalez Arroyo's "fluids" were on her thigh and on her bed. Gonzalez Arroyo gave her

---

[9] Doe did not say anything to McFarland about also eating a marijuana edible that day.

a mean look and came toward her again. Doe told him " 'No. Get away.' " Gonzalez Arroyo asked her why and Doe said she did not want it happening. Gonzalez Arroyo left and went to his room. Doe waited a few minutes until she thought he was asleep then went to the bathroom to clean herself. Doe also cleaned her bed somewhat and went back to sleep.

A few days later, Gonzalez Arroyo came up to Doe and asked for "another chance" because the previous time "didn't come out right." Doe refused.

### f. DNA evidence

After interviewing Doe, Garcia and another officer went to Gonzalez Arroyo's house to collect evidence. They took two blankets and a mattress cover from Doe's bed for DNA analysis.[10] The other officer collected DNA swabs from Gonzalez Arroyo and L.A., while another officer collected a DNA swab from Doe.

Dr. Zinaida Brameier, a criminalist with the California Department of Justice (DoJ), testified that she received two blankets and a mattress cover to analyze. One of the stains she analyzed, labeled "Stain A", contained a large quantity of nucleated epithelial cells,[11] but no sperm cells. Two other stains, B and D, returned positive results for sperm cells, with D's result stronger than B's. Dr. Brameier sent cuttings of stains B and D to a different laboratory for DNA testing.[12]

Nan Nguyen, a senior criminalist at the DoJ, testified that she performed the DNA analysis on the swabs collected from Doe, Gonzalez Arroyo, and L.A., as well as the

---

[10] Doe testified that she had not washed her bedding since the incident.

[11] Dr. Brameier explained that nucleated epithelial cells are found in a person's mucous membranes, and thus would come from the inside of one's mouth, vagina, or anus.

[12] Dr. Brameier confirmed that the DoJ retained cuttings and samples from such evidence in the event either party wanted to conduct additional testing. Neither the prosecution nor the defense requested further testing of the bedding.

10

cuttings provided by Dr. Brameier.  In stains B and D, Nguyen found sperm that matched Gonzalez Arroyo's DNA sample.  Nguyen determined that Doe was the major contributor of the non-sperm cells that were found in stain B.  L.A. was excluded as the minor contributor to stain B, and both Doe and L.A. were excluded as contributors to stain D.

### g. Child Sexual Abuse Accommodation Syndrome (CSAAS) testimony

Dr. Anna Washington, a psychologist with the University of California Davis Child and Adolescent Abuse Resource and Evaluation Center (CAARE) testified about common myths or misconceptions relating to child sexual abuse.  Dr. Washington did not know any of the parties involved in the case, had not read any police reports or interviews, and did not know what charges or allegations had been made in the case.

Dr. Washington identified several common myths or misconceptions that lay people have about child sexual abuse, specifically: (1) the perpetrator is often a stranger to the child; (2) a child will physically fight, scream, or attempt to run away when they are being abused; (3) immediately afterward, a child will report the abuse to someone they know; (4) a child who reports abuse will provide many details about it; and (5) those details are shared consistently each time the child reports the abuse.

According to Dr. Washington, children are often abused by someone they know and trust and with whom they previously enjoyed spending time.  Once the abuse begins, the child may not like it, but they may be conflicted because they enjoy the other aspects of their relationship with the abuser.  The child will find it difficult to report what has happened because they are worried about getting the abuser in trouble.

In addition, the abuser may threaten, intimidate, or use other means of manipulation or grooming to convince the child something bad will happen if they tell anyone.  The abuser may threaten to harm the child or someone else they care about.  The

11

abuser may tell the child no one will believe them, that the child will be taken from their family and placed in foster care, or other frightening things will happen if they report the abuse. The child may also fear that other family members will not believe them, will blame them, or will be upset that the child got the abuser in trouble, especially where the abuser is someone they also love and trust.

Dr. Washington testified to certain factors that may ultimately lead to a child reporting the abuse. Very young children may accidentally disclose the abuse due to not understanding that the conduct they are relating is wrong. Other children may disclose the abuse to a friend who then tells an adult.

Dr. Washington also explained why an initial report of abuse may lack all of the details or why details may vary on retelling. A person's memory does not function like a recorded video that can be replayed. When a particular event happens frequently, such as in cases of chronic abuse, a person will be able to recall core details but not peripheral details. For a child, the core details would be things that are "emotionally salient [to] a child[,]" such as who is abusing them or the "general behaviors." Peripheral details would be things with less emotional significance, such as what the abuser was wearing, or where and when the abuse occurred on each occasion.

Abused children commonly have symptoms of trauma, including avoidance and disassociation, which make it more difficult for them to report the abuse. The children do not like to think about the abuse let alone talk about it with someone else. Disclosure is often done in increments, where a small amount is shared at first and, depending on whether they get a supportive response, they will disclose more. Conversely, if the response is negative or angry, the child may not share anything further.

Finally, Dr. Washington explained that there is no profile that can be used to identify a person as a child abuser. Abusers are more likely to be known to the victim

12

and more likely to be male, but otherwise there is "no set of personality characteristics" that could be used to suggest a person is committing sexual abuse.

### 2. Defense case

#### a. Gonzalez Arroyo's testimony

Gonzalez Arroyo testified on his own behalf. At the time of trial, he was 63 years old and had been married to L.A. since 2001, though they had no children together. Gonzalez Arroyo had four daughters and "around 16" grandchildren from his first marriage. In 2014, five of his grandchildren came to live with him and L.A. Gonzalez Arroyo worked in the fields, from January until the beginning of October. In January, he would work four or five days a week, but that would increase in February and March and "[s]tarting from April," he would work nearly every day. Gonzalez Arroyo would typically wake up around 5:00 a.m. for work and go to sleep around 8:30 p.m. or 9:00 p.m. He did not work in December but would normally travel to Mexico with L.A. returning in early January. Gonzalez Arroyo testified that he, L.A., and the two youngest grandchildren were in Mexico from December 10, 2015 to January 10, 2016.

Gonzalez Arroyo would see Doe when he got home from work and on weekends but they did not talk to each other because he did not speak English and Doe did not speak Spanish. L.A. was responsible for taking care of Doe and the other grandchildren. Gonzalez Arroyo did not argue with Doe or physically punish her, and L.A. was the one who disciplined the grandchildren.

Doe had her own bedroom and Gonzalez Arroyo never entered it except to paint the walls one time while Doe was at school. Doe slept on a futon in her room. The futon had previously been in a different room and used by others. Gonzalez Arroyo said that he did not clean the futon before it was moved into Doe's room for her to sleep on. Before Doe moved in, Gonzalez Arroyo sometimes slept on the futon and he and L.A.

13

would have sex on it once or twice a month.[13]  Around once a month, Gonzalez Arroyo would masturbate while lying on the futon.  When he did so, Gonzalez Arroyo would sometimes ejaculate on the futon but would only occasionally wipe it afterwards.

Gonzalez Arroyo denied ever touching or grabbing Doe's thighs or buttocks, or making sexual comments to her in Spanish, trying to take off her sweatpants, or touching her in a sexual manner.  Gonzalez Arroyo said he never walked around the house naked and did not go to sleep naked.  Gonzalez Arroyo denied having any sexual interest in Doe and denied ever trying to have sex with her or asking her to "give [him] a chance to have sex with her."

### b. Other defense witnesses

Three of Gonzalez Arroyo's daughters and two of his granddaughters testified as character witnesses.  All five testified Gonzalez Arroyo was not the kind of person who would rape or molest a girl, nor did he have a reputation as someone who would sexually assault anyone.  On cross-examination, three of the five witnesses admitted they did not know what the character traits were of a person who would commit rape or sexual assault.  One of Gonzalez Arroyo's daughters testified that she did not "get the vibe that [Gonzalez Arroyo] is [] a pervert or a rapist."  One of Gonzalez Arroyo's granddaughters testified that she believed the character traits of a rapist or molester were that they were "more pervert[ed]" and "more touchy … towards one person."

---

[13] On cross-examination, Gonzalez Arroyo said he and L.A. did not have sex on the futon after Doe moved in.  In rebuttal, the prosecutor introduced a portion of L.A's preliminary examination testimony in which she said that she and Gonzalez Arroyo had sex on Doe's bed on one occasion before May 25, 2016.

## II.    DISCUSSION

### A. Exclusion of evidence

Gonzalez Arroyo argues that the trial court abused its discretion and violated his federal and state constitutional rights to present a defense, confront adverse witnesses, and to due process, when it granted the prosecution's in limine motion to exclude evidence of Doe's alleged prior sexual conduct and DNA results from an additional stain (stain C) discovered on Doe's bedding.[14]

#### 1. Additional background

The prosecutor moved in limine to exclude evidence of Doe's alleged prior sexual conduct as well as evidence of DNA testing of stain C which revealed sperm cells from an unidentified male.  The prosecution argued that the evidence was irrelevant and should also be excluded pursuant to Evidence Code sections 352, 782 and 1103.

At the hearing on the motion, Gonzalez Arroyo argued that the evidence of Doe's possible prior sexual activity would be relevant to the issue of her credibility.  Gonzalez Arroyo also argued that evidence was relevant to her motive to lie as she was breaking her grandparents' rules by sneaking her boyfriend into the house and having sex with him in her room.

The trial court determined that evidence of Doe's sexual conduct with her boyfriend "has [no] relevance to her credibility" and found that there was no basis for holding a hearing pursuant to Evidence Code section 782 at which Doe could be questioned about that conduct.  The defense would be able to "introduce evidence of and cross-examine [Doe] regarding … whether or not she obeyed" the house rules and

---

[14] Gonzalez Arroyo also argues that, to the extent the court finds he has forfeited these claims due to trial counsel's failure to preserve them below, his trial counsel provided ineffective assistance.  The Attorney General does not raise forfeiture and because we will address Arroyo's arguments on the merits, we need not and do not address his ineffective assistance claim.

whether Gonzalez Arroyo disciplined her. The court also found that the presence of Doe's nucleated epithelial cells had minimal relevance since those cells could be deposited on her bedding in multiple ways aside from her engaging in sex with her boyfriend.

The court also found that, pursuant to Evidence Code section 352, that any probative value of evidence of Doe's prior sexual activity or the presence of her nucleated epithelial cells was substantially outweighed by the prejudicial impact. The trial court indicated that introducing the DNA evidence "would necessitate an undue consumption of time" given it would require testimony "about all of the various ways that [] Doe's epithelial cells, i.e., her saliva, sweat, and vaginal fluid in various amounts would or could end up on her bedding." The trial court was also concerned that DNA evidence regarding Doe's epithelial cells and an unknown contributor of DNA would create "a substantial danger of confusing" or misleading the jury.

The court indicated that the defense was not precluded from introducing evidence that Doe had a boyfriend, that she was defiant toward Gonzalez Arroyo, or that she might otherwise have shown some bias that would suggest a motive to lie about Gonzalez Arroyo's conduct.

As to evidence relating to the DNA contained in stain C, the trial court found that it was not relevant as the "question is how [Gonzalez Arroyo]'s sperm ended up on the bed." Evidence of another person's sperm "is going to necessitate an undue consumption of time and create an undue danger of undue prejudice to [] Doe for the reasons the Court previously stated, create a substantial danger of confusing the issues by creating an impression in the jury that now they're supposed to focus on somebody else's semen, and create a substantial danger of misleading the jury." The trial court also found that the evidence was inadmissible under Evidence Code section 782 as it sought to introduce Doe's prior sexual conduct.

16

## 2. Applicable legal principles and standard of review

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Under California's rape shield law, however, "[e]vidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related offense only under very strict conditions," and it is not admissible for certain purposes. (*People v. Fontana* (2010) 49 Cal.4th 351, 362 (*Fontana*); Evid. Code, § 1103, subd. (c).) Such evidence may be admissible "when offered to attack the credibility of the complaining witness and when presented in accordance with the procedures under [Evidence Code] section 782." (*Fontana, supra*, at p. 362.)

"Evidence Code section 782 is designed to protect victims of molestation from 'embarrassing personal disclosures' unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility. [Citation.]" (*People v. Bautista* (2008) 163 Cal.App.4th 762, 782 (*Bautista*).) The statute authorizes a procedure by which a defendant seeking to introduce evidence of the victim's prior sexual conduct files a written motion accompanied by an affidavit containing an offer of proof concerning the relevance of the proffered evidence to attack the credibility of the victim. (Evid. Code, § 782, subd. (a)(1), (a)(2); *People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514; see generally *Fontana, supra*, at p. 354.) If the court finds the offer of proof sufficient, it orders a hearing outside the presence of the jury to allow questioning of the complaining witness regarding the offer of proof. (Evid. Code, § 782, subd. (a)(3); *Fontana, supra*, 49 Cal.4th at p. 354.) At that hearing, if the trial court concludes the evidence is relevant and not inadmissible pursuant to Evidence Code section 352,[15] the

---

[15] Evidence that is otherwise relevant and admissible may nonetheless be excluded under Evidence Code section 352 if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) (continued)

17

trial court may make an order stating what evidence may be introduced and the nature of the questions permitted. (Evid. Code, § 782, subd. (a)(4); *Fontana, supra*, at p. 354.)

On appeal, we review the trial court's decision on the admissibility of evidence under Evidence Code sections 352 and 782 for an abuse of discretion. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 408; *Bautista*, *supra*, 163 Cal.App.4th at p. 782.)

### 3. Analysis

#### a. Doe's alleged prior sexual conduct

Gonzalez Arroyo asserts that evidence of Doe's alleged prior sexual conduct was relevant to disprove that Doe's nucleated epithelial cells were deposited on the bedliner when Gonzalez Arroyo had intercourse with her. He also argues that evidence of Doe's prior sexual conduct was relevant to her credibility because it was inconsistent with her claim that Gonzalez Arroyo took her virginity. We conclude the trial court did not abuse its discretion in excluding the evidence. Even assuming it had some relevance to the case, "its probative value [was] substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice … ." (Evid. Code, § 352.)

The need for an alternative explanation for how Doe's nucleated epithelial cells came to be deposited on her bedding was minimal. Dr. Brameier testified that such cells are present in a person's mouth, vagina, and anus, and there was no way to determine the origin of the cells found on Doe's bedding. The prosecution told the jury in final argument that it was not possible to prove that Doe's cells came from her vagina and that they were deposited at the same time as Gonzalez Arroyo's sperm cells. Even if the jury had been told that Doe and another male previously had sex on her bed, the jury could

---

creates substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

have still reasonably found that the presence of Doe's cells and Gonzalez Arroyo's sperm cells established that he had intercourse with Doe.

Against that minimal relevance, the potential prejudice was significant. As the California Supreme Court explained in *Fontana*, "[f]or some jurors, the fact that the victim has engaged in sexual conduct outside of marriage automatically suggests a receptivity to the activity or is proof that the victim got what she deserved—neither of which is a rational or permissible inference. [Citation.]" (*Fontana*, *supra*, 49 Cal.4th at p. 370.)

Turning to the relevance of Doe's prior sexual conduct in relation to her telling McFarland during her forensic interview that Gonzalez Arroyo had taken her "virginity," we agree with the Attorney General that this evidence would have some relevance.

Again, however, Doe's (possibly) false statement to McFarland that she was a virgin when Gonzalez Arroyo had sex with her had minimal probative value as to whether she lied about Gonzalez Arroyo having sex with her against her will. The prejudicial impact of this evidence would far outweigh that limited probative value. The trial court did not abuse its discretion in concluding that this evidence was inadmissible pursuant to Evidence Code section 352.

### b. DNA evidence on stain C

Gonzalez Arroyo next argues the evidence of an unidentified male's sperm was relevant because it supported his claim that the futon itself had been used by many people, including Gonzalez Arroyo, before it became Doe's bed. We disagree.

DNA testing of stain C revealed the presence of sperm cells from an unidentified male. Gonzalez Arroyo fails to explain, however, how the presence of this sperm has any bearing on the principal issue to be decided in this case: whether Gonzalez Arroyo raped Doe on her futon. Doe testified that Gonzalez Arroyo did so, and Gonzalez Arroyo testified that he did not. According to the DNA analysis, Gonzalez Arroyo's sperm cells

19

and Doe's nucleated epithelial cells were both found in stain B. Although Gonzalez Arroyo testified that, before Doe moved in, he and L.A. sometimes had sex on the futon and he would occasionally ejaculate on it after masturbating, that testimony does not support a theory that some unidentified man also ejaculated on the futon, nor does it make the presence of that unknown person's DNA relevant to the question of Gonzalez Arroyo's guilt. The jury could still believe that Gonzalez Arroyo was testifying truthfully regarding his use of the futon before Doe moved in without also hearing that someone else's sperm cells were found on that bedding.

In addition, the probative value of this evidence was minimal especially when compared to its potential to create a substantial danger of undue prejudice as it would lead the jury to speculate whether Doe was engaging in consensual sexual activity, a fact which has no bearing on whether Gonzalez Arroyo sexually assaulted her. As a result, the trial court did not abuse its discretion in finding the DNA evidence relating to stain C was inadmissible because it was not relevant or appropriate for admission pursuant to Evidence Code section 352.

### c. No prejudice

Even assuming the trial court abused its discretion in excluding evidence of Doe's alleged prior sexual history or the DNA evidence discovered on stain C, Gonzalez Arroyo cannot show that he was prejudiced thereby. Error in admitting or excluding evidence at the guilt phase of a trial is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*).[16] Under *Watson*, we ask whether there is a

---

[16] Gonzalez Arroyo also argues that exclusion of this evidence violated his due process rights and that the error is therefore subject to review under the stricter standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) pursuant to which the burden is on the Attorney General to show the error was harmless beyond a reasonable doubt. We disagree that the exclusion of this evidence violated Gonzalez Arroyo's due process rights or deprived him of his right to a fair trial.

20

reasonable chance—more than an abstract possibility but not necessarily " 'more likely than not' "—that a result more favorable to defendant would have been reached absent the assumed error. (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041.)

In this case, given that Gonzalez Arroyo's sperm cells were found on Doe's bedding along with her cells—a fact Doe would have no way of knowing was true at the time she reported Gonzalez Arroyo's conduct—it is not reasonably probable that the admission of evidence that Doe may have engaged in sexual activity with her boyfriend on her bed would lead a jury to acquit Gonzalez Arroyo. Likewise, the evidence from stain C that another unidentified male ejaculated on Doe's bedding would not reasonably have led to Gonzalez Arroyo's acquittal. Even if we assumed Doe misrepresented to McFarland in her forensic interview that she was a virgin before Gonzalez Arroyo raped her, it is unlikely a jury would have found Gonzalez Arroyo not guilty on the charges had the evidence from stain C been admitted. Defense counsel cross-examined Doe and highlighted the inconsistencies in her testimony to the jury, yet the jury found her story more credible than Gonzalez Arroyo's.

### B. Prosecutorial misconduct

Gonzalez Arroyo next argues that the prosecutor committed misconduct during the hearing on the in limine motions by misrepresenting that Doe's epithelial cells could have come from sweat, thereby causing the trial court to exclude the evidence of Doe's prior sexual conduct. In addition to contesting this claim on the merits, the Attorney General argues that Gonzalez Arroyo has forfeited this argument by failing to raise it at the in limine hearing. We need not reach the Attorney General's forfeiture argument and ultimately conclude that Gonzalez Arroyo's claim has no merit.[17]

---

[17] Since we address Gonzalez Arroyo's contention on the merits, we need not and do not consider his alternative argument that trial counsel was ineffective for failing to object on this ground at the hearing on in limine motions.

### 1. Additional background

At the hearing on the in limine motion to exclude evidence of Doe's alleged prior sexual conduct and the DNA results from stain C, the prosecutor stated that Dr. Brameier would testify that it was not possible to precisely determine the source of Doe's epithelial cells as those cells could have come "from drool, snot, sweat, or sexual activity." The trial court asked the prosecutor if it was his position, based on his conversations with the experts, "even sweat can leave the nucleated epithelial cells?" The prosecutor responded, "[i]n smaller amounts, [] yes." The trial court concluded that the evidence in question had little to no relevance given the multiple ways in which Doe's cells could have been deposited on her bedding, such as sweat, saliva, or vaginal discharge. The court also determined that the evidence was inadmissible under Evidence Code section 352.

At trial, defense counsel cross-examined Dr. Brameier on whether nucleated epithelial cells could be deposited from sweat. Dr. Brameier responded that a "different type of nucleated epithelial cell[]" comes through a person's sweat glands, but her examination of the sweat stains on the bedding did not show any. Dr. Brameier clarified that she was not saying, "they do not exist there" but she would expect to find "a lot more [nucleated epithelial cells] from saliva or vaginal fluid."

### 2. Applicable legal principles and standard of review

A prosecutor engages in prosecutorial misconduct under state law if he or she uses deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*People v. Morales* (2001) 25 Cal.4th 34, 44.) " 'Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " (*People v. Bell* (2019) 7 Cal.5th 70, 111.) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more

favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

### 3. Analysis

#### a. No misconduct

While the prosecutor stated during the in limine hearing that nucleated epithelial cells can be deposited from sweat, this statement was not entirely untrue nor does it appear that the statement was made in order to deceive the trial court. Dr. Brameier testified at trial that such cells *can* come from sweat, though in much smaller amounts than would be deposited by saliva or vaginal fluids. This is mostly consistent with the prosecutor's representation to the court that sweat can produce such cells "in smaller amounts."

In addition, the transcript of the in limine hearing does not support Gonzalez Arroyo's claim that the prosecutor's arguably misleading statement was a significant factor behind the trial court's exclusion of the evidence of Doe's alleged prior sexual conduct and the DNA evidence from stain C. Instead, the trial court found that this evidence had little to no relevance to the case, and even more importantly, that its probative value was substantially outweighed by its potential prejudice. Assuming the court was under the false impression that Doe's sweat was a possible source of the cells on her bedding, it was nonetheless true that there was more than one source of those cells.

We are also not persuaded that the prosecutor committed misconduct by informing the court at the in limine hearing that he would not argue "where exactly these … cells came from" but then, in final argument, stating that Doe's cells came from vaginal discharge. Gonzalez Arroyo's characterization of the prosecutor's final argument is not supported by the record. The prosecutor expressly admitted that the mixture of Doe's cells and Gonzalez Arroyo's sperm cells in stain B was "not conclusive evidence" and that "[s]cience itself cannot tell you how his DNA and her DNA came together." The

23

prosecutor then argued that, due to the positioning of stain B in the center of the bedding where a person's torso would normally be during sexual intercourse, it was a more reasonable inference that Doe's cells were from vaginal fluids as opposed to saliva. The prosecutor's argument to the jury was entirely consistent with its representations at the in limine hearing. As a result, we conclude there was no prosecutorial misconduct.

### b. Assuming misconduct, there was no prejudice

Even assuming that the prosecutor's statements about sweat as a source of nucleated epithelial cells amounted to misconduct, Gonzalez Arroyo cannot show a reasonable probability of a different result had the trial court not considered those statements in ruling on the in limine motion. The trial court's decision to exclude evidence of Doe's alleged prior sexual conduct and the DNA evidence from stain C was based on its independent conclusions about both the relevance of that evidence and, under Evidence Code section 352, that its significant prejudicial impact outweighed its probative value.

Furthermore, at trial the jury was presented with the DNA evidence and heard both Doe's and Gonzalez Arroyo's testimony about what happened. Although DNA evidence is not required to prove guilt in a sexual assault case, such evidence corroborated Doe's testimony. There is no reasonable probability that the jury would have returned a more favorable result for Gonzalez Arroyo had it also been presented with the excluded evidence.

### C. CSAAS testimony

Gonzalez Arroyo argues that the trial court abused its discretion by denying his in limine motion to exclude Dr. Washington's testimony on CSAAS. First, he claims that CSAAS testimony is unreliable and unduly prejudicial. Second, Gonzalez Arroyo contends that Dr. Washington's testimony exceeded the bounds of permissible CSAAS evidence because she testified about "common character traits, or the lack thereof, of a

24

stereotypical child molester." Gonzalez Arroyo therefore concludes that his constitutional rights to due process were violated because the CSAAS evidence was used to unfairly corroborate and bolster Doe's allegations against him.

As we explain below, we conclude the trial court did not err in admitting the CSAAS testimony and reject Gonzalez Arroyo's arguments in their entirety.

### 1. Additional background

Before trial, the prosecutor moved in limine to admit Dr. Washington's testimony regarding CSAAS, arguing that her testimony would educate the jury about "myths and misconceptions regarding victim behavior" as well as common misconceptions regarding child molesters. He indicated that the evidence was necessary in part because the defense planned to call a number of character witnesses who would testify that, in their opinion, Gonzalez Arroyo did not "have the character" of a child molester. The prosecutor represented that Dr. Washington would testify about "victims generally," would not refer to the evidence as a "syndrome," and would not offer statistical evidence relating to the truthfulness or falsity of allegations of abuse. The prosecutor also suggested that the court provide a limiting instruction to the jury regarding this testimony.

Gonzalez Arroyo moved in limine to exclude Dr. Washington's testimony arguing that such testimony is unreliable, unduly prejudicial, and improperly vouches for the credibility of the complaining witness. In the event the court was inclined to admit the testimony, Gonzalez Arroyo argued it should be limited to "CSAAS syndrome attributes and to dispelling purported myths about victim behavior." Gonzalez Arroyo also argued that Dr. Washington should not be allowed to testify that a "typical molester [is] someone well known to the victim."

The trial court ruled that it would admit the evidence, subject to the limitations identified by the prosecutor. The prosecutor reiterated that, because the defense intended to call character witnesses who would give their opinion about whether Gonzalez Arroyo

25

was the kind of person who could be a child molester, he intended to have Dr. Washington testify that "there is no profile that joins all the types of people that commit these kinds of acts." Defense counsel made no further argument on that issue. The trial court also noted that the parties had jointly drafted a jury instruction on the matter.

### 2. Applicable law and standard of review

Expert opinion testimony is admissible when the subject matter is "beyond common experience" and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) " 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. [Citations.]" (*Lapenias, supra,* 67 Cal.App.5th 162, 171; see also *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117.) CSAAS evidence "is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the

secretive environment often created by an abuser who occupies a position of trust."
(*Ibid.*) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301, fn. omitted (*McAlpin*).)

### 3. Analysis

#### a. No abuse of discretion in admitting CSAAS evidence

Gonzalez Arroyo initially objects to Dr. Washington's testimony on the grounds that it may improperly be used as evidence of guilt and there is no reason to believe that the " 'commonly held misconceptions' " about how a child victim may respond to sexual abuse are still commonly believed. We are not persuaded.[18]

The California Supreme Court ruled in *McAlpin* that CSAAS testimony is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse victims' behavior and to explain seemingly contradictory behavior of a child sexual abuse victim. (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1302.) As this court is bound by decisions of the California Supreme Court, Gonzalez Arroyo's citations to decisions from other jurisdictions that reached different outcomes on the admissibility of CSAAS testimony have no effect on the binding nature of *McAlpin*. (See *People v. Ramirez*

---

[18] Because we will address Gonzalez Arroyo's arguments on the merits, we need not and do not address his alternative claim that he received ineffective assistance of counsel at trial.

(2023) 98 Cal.App.5th 175, 216 (*Ramirez*).) Based on this binding precedent, as well as the substantial precedent set forth above regarding admissibility of CSAAS evidence, we conclude the trial court did not abuse its discretion when it ruled that the prosecution's proposed expert testimony on CSAAS was relevant and admissible for the limited purpose for which it was admitted in the instant case. (See *Lapenias, supra*, 67 Cal.App.5th at p. 172; *Patino, supra*, 26 Cal.App.4th at pp. 1744–1745; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

### b. The testimony did not exceed the permissible bounds

Gonzalez Arroyo next argues that Dr. Washington's testimony went beyond her expertise and the permissible scope of CSAAS evidence when she improperly testified that aside from generally being male and a person known to the victim, there is no other profile or set of common traits for persons who sexually abuse children. We disagree.

After detailing her academic credentials as well as her work experience in the field of child sexual abuse, Dr. Washington testified that there had been multiple unsuccessful studies conducted to try to "identify people who are sexual abuse[rs]" but that "perpetrators are more likely to be known to the victim … [and] are more likely to be male." Defense counsel did not challenge this testimony on cross-examination.

Gonzalez Arroyo acknowledges that similar testimony, at least as to the question of whether perpetrators are more likely to be known to the victim, was recently approved in *People v. Sedano* (2023) 88 Cal.App.5th 474 (*Sedano*) and was also approved in *McAlpin, supra,* 53 Cal.3d 1289. He argues that these cases are distinguishable. In his view, *Sedano* failed to explain how testimony that an abuser is usually known to the victim fits within the rubric of CSAAS evidence, which is designed to explain how the *victims* may behave. As for *McAlpin*, the testimony was not CSAAS evidence and was presented by a police officer not an expert in treating victims of child abuse. We see no basis for distinguishing these cases.

28

In *McAlpin*, while the testimony was offered by a police officer not a psychologist, the basis for admitting the testimony was the same: there is a common misperception that child abusers are often strangers. (*McAlpin, supra,* 53 Cal.3d at pp. 1302–1304.) *Sedano* is more directly on point, as the CSAAS expert in that case testified that, not only are most abusers known to the victim but went so far as to assert that " '94 percent of these kids in his study had a pre-existing relationship with the molester.' " (*Sedano*, *supra*, 88 Cal.App.5th at p. 478.) In this case, Dr. Washington offered no specific statistical evidence, stating only that the abuser is "more likely" to not be a stranger and more likely to be male but otherwise there was no typical set of characteristics that would identify someone as an abuser. Her testimony did not exceed the bounds set by the trial court nor the bounds approved by either *McAlpin* or *Sedano* and the trial court did not abuse its discretion in admitting it.

### c. No due process violation

Finally, Gonzalez Arroyo contends that the admission of the CSAAS evidence violated his due process rights to a fair trial because it "allowed the jury to make the unreasonable inference that, because Doe acted in ways" consistent with that described by Dr. Washinton, Doe "was a credible witness."

Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process. (*Lapenias, supra*, 67 Cal.App.5th at p. 174, citing *People v. Hall* (1986) 41 Cal.3d 826, 834–835.) Reviewing courts have also routinely held the admission of CSAAS evidence does not violate due process. (See, e.g., *Patino, supra*, 26 Cal.App.4th at pp. 1744–1745 [trial court's admission of CSAAS evidence did not violate due process].) For the same reasons, we conclude that Dr. Washington's testimony about CSAAS did not violate Gonzalez Arroyo's constitutional right to due process.

Further, we have already rejected Gonzalez Arroyo's contentions that (1) the trial court abused its discretion in admitting the evidence; and (2) the expert testimony exceeded the permissible bounds of CSAAS evidence. The "rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised" on appeal. (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29.) Having rejected each of the underlying claims of error in admitting the CSAAS evidence, we accordingly reject Gonzalez Arroyo's associated due process claim.

### d. No prejudice

Even if we were to assume that the trial court abused its discretion in admitting Dr. Washington's testimony, Gonzalez Arroyo cannot show that he was prejudiced by that error. As discussed ante (pt. II.A.3.c.), error in admitting or excluding evidence at the guilt phase of a trial is reviewed under the standard set forth in *Watson*, *supra*, 46 Cal.2d at p. 837.

The evidence implicating Gonzalez Arroyo, both direct and circumstantial, was significant. His sperm was found on Doe's bedding, mixed with cells that most likely came from her vaginal fluids, corroborating her testimony about Gonzalez Arroyo raping her. In addition, contrary to Gonzalez Arroyo's contention, the prosecutor did not refer to Dr. Washington's testimony in refuting the defense's character witnesses' testimony that Gonzalez Arroyo did not have the characteristics of a child molester. The prosecutor simply asked those witnesses if they could identify what those characteristics might be. Their inability to answer that question was sufficient in and of itself to undercut the credibility of their opinions on the matter. Accordingly, there is no reasonable probability that, absent Dr. Washington's testimony, a more favorable result would have been reached for Gonzalez Arroyo.

### D. Instructional error

Gonzalez Arroyo next argues that the court erred in instructing the jury with CALCRIM No. 1193, related to CSAAS expert testimony, because the instruction creates a reasonable likelihood the jurors would use the expert testimony to determine whether Doe's testimony was true. We disagree.

### 1. Additional background

Before trial, Gonzalez Arroyo argued that CALCRIM No. 1193 did not adequately cure the prejudice inherent in CSAAS testimony because the jury would be tempted to use the evidence to conclude that he was guilty of the charged offenses. As an alternative, Gonzalez Arroyo requested that the court instruct the jury with CALJIC No. 10.64 instead.

However, at the hearing on in limine motions, the trial court stated that the parties had jointly drafted a jury instruction regarding Dr. Washington's testimony. After the close of evidence, as the court went over the jury instructions with the parties, they agreed without further comment that the court would instruct the jury with CALCRIM No. 1193.

The court instructed the jury, as follows: "You have heard testimony from Dr. Anna Washington regarding the behaviors of victims of juvenile sexual assault victims [*sic*]. Dr. Anna Washington's testimony regarding behaviors of victims of juvenile sexual victims [*sic*] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of that testimony."

### 2. Applicable law and standard of review

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th

31

1082, 1088.) When we review a purportedly erroneous instruction, we consider
" 'whether there is a reasonable likelihood that the jury has applied the challenged
instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43
Cal.4th 959, 1028.) We consider the instructions as a whole and " 'assume that jurors are
intelligent persons and capable of understanding and correlating all jury instructions
which are given.' " (*Ibid.*)

### 3. No error in instructing with CALCRIM No. 1193

The trial court did not err in instructing the jury with CALCRIM
No. 1193 because it is not reasonably likely that jurors understood the instruction as
permitting the use of Dr. Washington's testimony for the improper purpose of proving
that Gonzalez Arroyo sexually abused Doe. "CALCRIM No. 1193 informs jurors that
they may use CSAAS evidence to evaluate whether the alleged victim's behavior, which
may appear inconsistent with being molested, was actually not inconsistent with the
behavior of a child sexual abuse victim." (*Ramirez, supra,* 98 Cal.App.5th at p. 219.) As
our court noted in *Ramirez*, "CSAAS evidence is relevant and admissible when an
alleged victim's credibility has been attacked. [Citation.]" (*Ibid*.) The instruction
expressly tells the jurors that they must not consider the CSAAS evidence as
determinative of the defendant's guilt.

Gonzalez Arroyo acknowledges that multiple courts "have rejected similar
challenges to CALCRIM 1193," such as *People v. Gonzales* (2017) 16 Cal.App.5th 494,
*People v. Munch* (2020) 52 Cal.App.5th 464, and *Lapenias*, *supra*, 67 Cal.App.5th 162.
This court did as well in *Ramirez, supra,* 98 Cal.App.5th at p. 220 and we see no reason
to depart from the reasoning employed in those cases. "Because the instruction correctly
informed the jury of the permissible and impermissible uses of [the CSAAS expert]'s
testimony, and because there is no reasonable likelihood that the jury misconstrued or
misapplied the instruction in the manner asserted by defendant, the trial court did not err

in instructing the jury with CALCRIM No. 1193, and defendant's due process right was not denied." (*Ramirez, supra*, at p. 220.)

Even were we to assume that the trial court erred in instructing the jury with CALCRIM No. 1193, and even if that error implicated his federal constitutional rights, we conclude that any such error was harmless beyond a reasonable doubt under *Chapman, supra*, 386 U.S. at page 24. As discussed above, the jury was expressly instructed not to use Dr. Washington's testimony as evidence that Gonzalez Arroyo committed the charged offenses. The jury was also instructed that they were the sole judge of a witness's credibility and were not required to accept an expert's opinion as true. The prosecutor did not mention Dr. Washington's testimony in his final argument, instead directing the jury to evaluate Doe's credibility using her demeanor, her consistency in describing what occurred, as well as her lack of any motive to lie. In addition, the CSAAS expert testified that she was not familiar with any of the facts of the case or any of the parties and was not proffering an opinion as to whether any molestation took place. While the physical evidence in this case was circumstantial, it corroborated Doe's testimony and supports a conclusion that Gonzalez Arroyo would have been convicted of the same offenses regardless of any alleged error in the instruction.

### *E. Cumulative error*

Gonzalez Arroyo next contends that the cumulative effect of the purported errors discussed above warrants reversal of the judgment. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) Here, we have found no errors, and where we assumed error, we also found no prejudice. Consequently, we reject Gonzalez Arroyo's cumulative error argument.

33

### F. Amendments to section 1170

After Gonzalez Arroyo was sentenced, the Legislature amended section 1170 to allow an aggravated prison term to be imposed only if the aggravating factors supporting it are admitted by the defendant or found true by a jury. (Sen. Bill No. 567 (2020–2021 Reg. Sess.); Stats. 2021, ch. 731, § 1.3.) As an ameliorative change, that legislation applies retroactively to this case that is not yet final on appeal. (*In re Estrada* (1965) 63 Cal.2d 740, 747.) Gonzalez Arroyo argues that, under the new standards, the court could not impose an upper term sentence on any of the substantive offenses because he did not admit any of the aggravating facts relied on by the court nor did a jury find them true.

While the parties agree that the amendments to section 1170 have retroactive application, they disagree on the question of prejudice. We need not reach this question however, because we are unable to determine, on this record, what the trial court would have done had it been aware of the limitations imposed by these amendments. Therefore, we will remand for resentencing for the trial court to apply the current version of section 1170, subdivision (b)(2).

The published opinions are in conflict on the standard to be applied when the court relies on multiple factors, some of which were not found by the jury or stipulated to by the defendant.[19] (Compare *People v. Flores* (2022) 75 Cal.App.5th 495, 500 [remand not required if appellate court concludes beyond a reasonable doubt that a jury would have found at least one aggravating factor true] with *People v. Lopez* (2022) 78 Cal.App.5th 459, 466 (*Lopez*) [all aggravating factors must have been found true beyond a reasonable doubt; if only some factors would have been found true, it must be reasonably probable the same sentence would have been imposed based on those] and *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*), review granted Oct. 12, 2022, S275655 [if at least one

---

[19] The issue is currently pending before our Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)

34

aggravating factor would have been found true beyond a reasonable doubt and it is reasonably probable any remaining aggravating factors relied on in imposing sentence would have been found true, assess likelihood of same sentence being imposed absent factors not meeting that standard].)

Gonzalez Arroyo contends that, regardless of the analysis this court may apply, "remand is required because it cannot be determined beyond a reasonable doubt that the jury would have found even one of the aggravating circumstances true." The Attorney General contends that we should apply the test from *Dunn*, which described the standard for assessing prejudice as follows: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing." (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410, fn. omitted.)

*Lopez* requires the reviewing court to evaluate every factor on which the court relied, and we read *Dunn* to require at least one aggravating factor that the trial court actually relied upon to withstand *Chapman* scrutiny. (See *Lopez, supra*, 78 Cal.App.5th at p. 466; *Dunn, supra*, 81 Cal.App.5th at pp. 409–410.) Where the record ' "clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion[,]" ' [citation] [¶] . . . remand would be an idle

35

act." (*People v. Flores* (2020) 9 Cal.5th 371, 432.)  In *People v. Salazar* (2023) 15 Cal.5th 416 (*Salazar*), the California Supreme Court recently reemphasized and expanded on this principle, stating "unless there is a clear indication from the sentencing court that it would be idle to do so, remand for resentencing is required.  When the applicable law governing the defendant's sentence has substantively changed after sentencing, *it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing*."[20]  (*Id.* at p. 431, italics added.)

At sentencing, the trial court found two mitigating circumstances: (1) Gonzalez Arroyo's insignificant criminal history (rule 4.423(b)(1)), and (2) his prior satisfactory performance on probation (rule 4.423(b)(6)).  The trial court also found three aggravating circumstances, specifically that the crimes "involve[d] a high degree of callousness … and cruelty" (rule 4.421(a)(1)); the victim "[was] particularly vulnerable" (rule 4.421(a)(3)); and Gonzalez Arroyo took "advantage of a position of trust and confidence" in committing the offenses (rule 4.421(a)(11)).  Following the guidance from the California Supreme Court and considering this record, " 'we cannot say with confidence what sentence [the court] would have imposed' if it were applying Senate Bill 567 in the first instance.  [Citation.]" (*Salazar*, *supra*, 15 Cal.5th at p. 432.)

As a result, we will remand the matter for resentencing under section 1170, as amended by Senate Bill No. 567.

---

[20] We recognize that *Salazar* was specifically addressing the amendments to section 1170, subd. (b)(6) which now mandate that the trial court impose a lower term where a qualifying trauma is found to be a contributing factor in the commission of the offense unless it makes specified findings. (*Salazar*, *supra*, 15 Cal.5th at p. 426.)

## G. Additional conduct credit

Gonzalez Arroyo argues, and the Attorney General concedes, that he is entitled to an additional 16 days of presentence conduct credits. We agree that the concession is well taken.

The trial court limited Gonzalez Arroyo's presentence conduct credits to 15 percent pursuant to section 2933.1. This was error. The 15 percent credit limitation of section 2933.1 applies to defendants who are convicted of violent felonies listed in section 667.5, subdivision (c). (§ 2933.1, subd. (a).) Gonzalez Arroyo was not convicted of any qualifying felony and he is thus entitled to an additional 16 days of presentence conduct credits.

## III.    DISPOSITION

The judgment is reversed and the matter is remanded for resentencing. On remand, the prosecution may elect to proceed by meeting the requirements of Penal Code section 1170, subdivision (b)(2) regarding aggravating circumstances or may elect to proceed on the current record. After the prosecution makes that election, the trial court shall resentence Gonzalez Arroyo according to current law, including a recalculation of Gonzalez Arroyo's credits.

_____
WILSON, J.

WE CONCUR:

_____
GREENWOOD, P. J.

_____
BAMATTRE-MANOUKIAN, J.

H049202
*People v. Raul Gonzalez Arroyo*